[Cite as *Scharf v. Scharf*, 2026-Ohio-3076.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Zachary Scharf, | : | |
| Plaintiff-Appellant/ Cross-Appellee, | : | No. 24AP-443 |
| | : | (C.P.C. No. 21DR-1981) |
| v. | | |
| | : | (REGULAR CALENDAR) |
| Kristen Scharf, | | |
| | : | |
| Defendant-Appellee/ Cross-Appellant. | : | |

D E C I S I O N

Rendered on August 11, 2026

**On brief:** *Reash Law Offices, LLC*, and *Maryellen Reash*, for appellant/cross-appellee. **Argued:** *Maryellen Reash*.

**On brief:** *Trolinger Law Offices, LLC*, and *Christopher L. Trolinger*, for appellee/cross-appellant. **Argued:** *Christopher L. Trolinger*.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

JAMISON, J.

{¶ 1} Plaintiff-appellant/cross-appellee, Zachary Scharf ("Zachary"), appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, granting a divorce and terminating his marriage to defendant-appellee/cross-appellant, Kristen Scharf ("Kristen"). Kristen has filed a cross-appeal. For the reasons that follow, we affirm in part and reverse in part.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} The parties were married on September 19, 2015 in Montgomery County, Ohio. Two children were born during the marriage: Z.S. on April 20, 2018; and L.S. on

July 4, 2020. The marital residence was located on Audubon Avenue, Hilliard, Franklin County, Ohio.

{¶ 3} Zachary filed a complaint for divorce on June 3, 2021. In that complaint, he alleged that the parties were incompatible, and that Kristen was guilty of gross neglect of duty. Kristen filed an answer and counterclaim on July 23, 2021. She admitted that the parties were incompatible but denied that she grossly neglected her duties. In her counterclaim, Kristen alleged that the parties were mutually incompatible and that Zachary acted with extreme cruelty and gross neglect in his duties. In his reply to Kristen's counterclaim, Zachary admitted that the parties were mutually incompatible but denied that he acted with extreme cruelty and gross neglect in his duties. Christopher Heckert was appointed guardian ad litem ("GAL") for the children.

{¶ 4} On November 20, 2021, the magistrate issued temporary orders. Both parties were designated temporary residential parents and legal custodians. Alternating parenting time was ordered, wherein Kristen would have three consecutive days, followed by Zachary having three consecutive days. A temporary child support order was issued requiring Zachary to pay $950 per month. The parties agreed to a temporary order requiring them to engage in parent coaching with Wendi Stern.

{¶ 5} Zachary filed a motion for a distributive award. In that motion, he alleged that Kristen, using a power-of-attorney, withdrew $26,000 from an account solely in Zachary's name. He further alleged that these funds were separate property.

{¶ 6} The parties filed competing motions to modify temporary orders. The magistrate ruled on those motions in an order dated March 31, 2023. As part of that order, Kristen was designated the temporary residential parent and legal custodian. Zachary was ordered to have parenting time pursuant to Loc.R. 27.1, Option D, which provided the party with parenting time on alternating weekends and each Wednesday. Zachary's child support order was modified to $1,395.34 per month. Zachary filed a motion to set aside the magistrate's order, which was denied by the trial court.

{¶ 7} On October 17, 2023, Heckert filed a GAL report and recommendation. Heckert reported that Kristen wanted full custody of the children with Zachary's parenting time allocated pursuant to Loc.R. 27.1, Option D. On the other hand, Zachary wanted Kristen to move back to central Ohio and obtain employment, a reduced child support

obligation, a shared parenting plan, control of school placement, and daily contact with the children. As for the children, Heckert was of the opinion that the children were too young to express their wishes. However, based on his observations, Heckert indicated that the children's enjoyment of each parent was visible during visits.

{¶ 8} Ultimately, Heckert opined that given the conflict between the parties and their inability to make mutual decisions regarding the children, a shared parenting plan would not work. He supported maintaining the temporary orders as final orders as it related to custody of the children. Heckert recommended that Kristen be designated the legal custodian of the children. He also recommended that the parties should follow Loc.R. 27.1, Option D, for parenting time.

{¶ 9} Prior to the start of trial, the parties came to an agreement as to the division of marital assets and debt. The trial in this matter was held on the following dates: October 23 through 25, 2023; November 27 and 28, 2023; December 4 and 5, 2023; January 9, 2024; and January 22, 2024.

{¶ 10} Dr. David Lowenstein testified that he performed a psychological evaluation of Zachary. He stated that his evaluation had some limitations due to his inability to speak with a number of relevant individuals, including Kristen. His initial impressions of Zachary were that he was very organized and was upset about the possibility of losing time with his children. Dr. Lowenstein observed the children in the home with Zachary. He stated that the children had a really good relationship with Zachary. Zachary was able to redirect them when they were about to break a rule and the children seemed comfortable and happy in the home.

{¶ 11} Dr. Lowenstein conducted a number of assessments with Zachary. Dr. Lowenstein determined through the assessments that Zachary was presenting the best picture of himself, but not to the point that the evaluations were invalid. In Dr. Lowenstein's opinion, Zachary was being honest during these assessments. Dr. Lowenstein observed that Zachary was firm and knew what he wanted, but not to the point that he was aggressive. Ultimately, Dr. Lowenstein opined that Zachary showed no signs of significant psychiatric or psychological difficulties that would interfere with his ability to parent his children.

{¶ 12} Eric Glassner testified that he was a family friend of the parties. He indicated that before and after the parties had children, their relationship seemed great. Glassner observed that both parties were good parents with happy children.

{¶ 13} Zachary testified that during their engagement, Kristen gave him an ultimatum to transition from full-time Army service, to one weekend per month. This was due to the travel required by his position. The parties agreed to reside in central Ohio, with the condition that they live on the west side of Columbus so that Kristen was as close as possible to her family in Dayton. When their first child was born in April 2018, the parties decided that Kristen would be a stay-at-home parent because Zachary was making more money. Zachary testified that following the birth of their first child, he noticed changes in Kristen's behavior. He described her behavior as being sad a lot of the time and losing interest in activities that they used to do together. Zachary testified that in order to help Kristen, he started doing more around the house and taking care of their child so that Kristen could get some breaks to recharge. He suggested counseling, but she rejected the idea.

{¶ 14} At a certain point after the birth of Z.S. the parties discussed her obtaining her Orton-Gillingham certification, so that Kristen could tutor students in the evenings when Zachary got home from work. The goal was for her to do ten sessions per week at $60 per hour. Zachary testified that Kristen planned to go back to work full-time after they had their second child and that child reached school age.

{¶ 15} After L.S. was born, Zachary noticed Kristen being more and more sad and withdrawing. He also noticed that her hygiene began to slip. He was worried about her and again proposed counseling. Zachary testified that Kristen's neglect of her hygiene negatively impacted their sex life. He admitted that he was unfaithful during the marriage and confessed that to Kristen. He testified that he had three separate one-night stands. Kristen left the marital residence with the children a few days after he confessed his infidelity. Zachary testified that Kristen indicated she would be back in a few days. However, she never returned, except to move out her belongings. Following Kristen's departure, Zachary did not see or talk to the children for a month.

{¶ 16} Zachary testified that Kristen used a power-of-attorney to transfer $26,000 from his bank account to hers. He indicated that the power-of-attorney was expressly for a situation in which he were to be killed during a military deployment.

{¶ 17} Zachary testified that when the parties had equal parenting time under the initial temporary orders, things went well after a period of adjustment.

{¶ 18} Regarding his participation in parent coaching with Wendi Stern, Zachary testified he had approximately 40 sessions with her. Later on in his testimony, he revised that number downward. After an initial period of resistance, he had a good working relationship with Stern. However, that relationship deteriorated toward the end because Zachary felt she was presuming he was guilty of abuse allegations made by Kristen. At that point, he terminated the counseling relationship with Stern.

{¶ 19} Zachary testified that in August 2022, L.S. had a seizure while in Kristen's care. He alleged that he was not informed about the situation until hours later. He also alleged that when he attempted to garner information from the hospital, he was unable to do so. The evening before the third day of trial, L.S. had another seizure and was taken to the hospital. Zachary testified that communication from Kristen was much better and that he was able to see his son at the hospital. In general, at the time of his testimony, Zachary believed that the communication between he and Kristen was moving in a positive direction.

{¶ 20} Zachary alleged that he had a non-existent relationship with Heckert. He indicated that he reached out to Heckert many times and never received replies. Zachary admitted that on one occasion when he did not feel Heckert was doing enough to press Kristen to be more accommodating, Zachary told Heckert to "get off your ass and do your damn job." (Tr. Vol. III at 200.) Zachary indicated that the relationship with Heckert changed immediately after that. He alleged that Heckert believed that Zachary's military service was problematic for his potential custody of the children. At the time of his testimony, Zachary was in the Individual Ready Reserve in the Army. That position required zero travel and no training. He believed it would be extremely unlikely that he would ever be deployed.

{¶ 21} Zachary was employed at Integrated Data Services ("IDS") building "dashboards" for websites. (Tr. Vol. III at 222.) He testified his salary was $120,000 per

year. As of the second to last day of trial, Zachary obtained additional full-time employment as a business intelligence analyst at Natera making $55.2863 per hour. With the two jobs, his hours were 5:00 a.m. to 5:00 p.m. At various times, he had project-based, temporary side jobs to make extra money.

{¶ 22} Zachary and Kristen stopped filing their taxes jointly. Kristen was claiming the children as dependents, which, according to Zachary, led to an additional $8,500 in tax liability for him in 2022. Zachary testified that additional child support, spousal support, and attorney fees to Kristen would cause his budget to go into a massive deficit.

{¶ 23} Kristen testified that she left the marital residence on May 13, 2021, and moved into her current residence sometime in August of that year. She claimed that she informed Zachary where she was going when she left the marital residence. At first, she intended to return, but Kristen alleged that Zachary blamed her for his infidelity. Kristen testified that Zachary did not permit her to return to the residence to collect her belongings. Kristen stated that she frequently offered Zachary extra time with the children, but he often declined. Kristen believed that communication with Zachary was getting worse. She did not believe that they would be able to make joint decisions regarding the children.

{¶ 24} Upon having their first child, Zachary did not help her with anything around the house. Kristen testified that Zachary rarely cared for the children. To Kristen, everything had to be Zachary's way. He frequently engaged in what Kristen described as coercive or intimidating behavior. Kristen alleged that if she did not do what he wanted, he would tell her about all the other women he could find who were better than her.

{¶ 25} Kristen testified that Zachary was "sexually violent" to her during the marriage. (Tr. Vol. VI at 615.) She explained that she believed he would withhold sex as a coercive tactic. As far as physical abuse, Kristen testified that Zachary would strike or kick her while they were sleeping. Zachary claimed that he did not remember doing so and was asleep if or when it happened. It should be noted that in his testimony, Zachary denied Kristen's allegations of abuse. There were no allegations that Zachary was ever physically abusive to the children. Kristen was diagnosed with Post-Traumatic Stress Disorder ("PTSD"). She attributed that to her experiences during her marriage to Zachary.

{¶ 26} As for her education history, Kristen has a bachelor's degree in psychology and Spanish. She also has a master's degree in education and school counseling. Kristen

obtained a certification in Orton-Gillingham. She explained that Orton-Gillingham is a methodology for helping students who struggle with reading, typically due to dyslexia. Kristen is a licensed school counselor and a licensed bullying prevention trainer. She testified that she was employed as a school counselor at Archbishop Alter High School making approximately $42,000 per year. Her employment there began in July of 2021. Her hours during the school year were 7:30 a.m. until 3:30 p.m. She was occasionally called into work during the summer.

{¶ 27} Kristen testified about her expenses. At the time of her testimony, she indicated she was paying for some utilities, internet, gym membership, and her and her parents' phone service. Her parents paid for some utilities, and she paid them what she was able to pay. At the time of trial, she was paying her parents $950 per month for rent.

{¶ 28} Katherine Gonzalez testified that she was Kristen's twin sister. When Kristen left the marital residence with Z.S. and L.S. in May 2021, she stayed with Katherine until August of that year. Katherine testified that approximately one week after Kristen began residing with her, Katherine started communicating with Zachary to facilitate video calls with the children and meetings at a local park. In her opinion, Kristen was a very attentive mother. Kristen had a strong support system of family and friends in the Dayton area. Katherine alleged that there were times that Zachary was behaving aggressively, including the most recent time L.S. was hospitalized for a seizure.

{¶ 29} The day before the second to last day of trial, Zachary filed a proposed shared parenting plan. Kristen filed a motion to strike said plan as untimely. Kristen's motion to strike was granted by the trial court.

{¶ 30} The trial court issued a judgment entry/decree of divorce on June 18, 2024. The court found that the parties be granted a divorce on the grounds of incompatibility, living separate and apart for a continuous period of over one year, and Zachary's adultery. It was ordered that Kristen be the children's sole legal custodian and residential parent. Zachary was ordered to have parenting time pursuant to Loc.R. 27.1, Option D. The trial court gave Zachary the right to claim Z.S. as a dependent for tax purposes. Kristen was entitled to claim L.S. as a dependent for tax purposes. Zachary was ordered to pay child support in the amount of $2,168.16 per month. Zachary was ordered to be responsible for 60 percent of extraordinary medical expenses, with Kristen being responsible for the other

40 percent. The trial court did not order spousal support and ordered the parties to pay their own attorney fees.

{¶ 31} It is from that decision that the parties now appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 32} Zachary assigns the following as trial court errors:

[1.] The trial court abused its discretion in striking Appellant's proposed shared parenting plan, based on objection that the mid-trial filing of the plan deprived Appellee of due process, when the parties operated under a shared parenting arrangement for 16 months on temporary orders, and the particulars of the proposed plan were proposed in settlement discussions and were specifically detailed during trial, giving Appellee ample opportunity to respond.

[2.] The trial court abused its discretion in failing to award shared parenting to Appellant, based on the recommendation of the GAL, after evidence of his bias was made clear to the court.

[3.] The trial court abused its discretion in failing to award shared parenting to Appellant, when it awarded all privileges normally included in shared parenting arrangements.

[4.] The trial court abused its discretion in awarding sole custody to Appellee, given evidence that Appellee had abused her custodial privileges, had exhibited dishonesty on the stand at trial, had strategized with blatant dishonest [sic] to impugn the character of Appellant in the eyes of the court to further her plan to deprive Appellant of parental rights, had demonstrated a pattern of interference with the relationship between Appellant and the Children, and had a history of mental instability that would place the Children in jeopardy.

{¶ 33} Kristen assigns the following as trial court errors:

[1.] The trial court erred and abused its discretion in the determination of incomes for both parties and by imputing income to each party without a finding of unemployment or underemployment for either party and by failing to make adequate findings and conclusions of law to support its income determinations or indicate any consideration of the factors contained in R.C. 3119.01(C)(10),(13) and (18) as it relates to the determination of incomes.

[2.] The trial court erred and abused its discretion in failing to make adequate findings and conclusions to support the income calculations for purposes of spousal support, failing to appropriately consider the statutory factors under R.C. 3105.18 and by failing to award spousal support to appellee/cross-appellant.

[3.] The trial court erred and failed to correctly complete the child support worksheet in the cost of health insurance and the work-related childcare costs.

[4.] The trial court erred and abused its discretion in awarding a tax exemption to the noncustodial parent and failing to consider and make findings on the statutory requirements of R.C. 3119.82 and the children's best interest to award tax exemption to noncustodial parent.

[5.] The trial court abused its discretion in failing to award attorney fees to appellee/cross-appellant under R.C. 3105.73.

## III. STANDARD OF REVIEW

{¶ 34} When deciding child custody matters, a trial court must follow R.C. 3109.04. However, "it has broad discretion to determine the appropriate allocation of parental rights and responsibilities." *Lupia v. Lupia*, 2026-Ohio-1059, ¶ 9 (10th Dist.). "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). As such, "[t]he standard of review in domestic relations cases is whether the trial court abused its discretion." *Scinto v. Scinto*, 2010-Ohio-1377, ¶ 4 (10th Dist.); *In re B.D.*, 2021-Ohio-3792, ¶ 24 (11th Dist.) (reviewing a trial court's decision to disregard an untimely shared parenting plan under an abuse of discretion standard); *Wagenbrenner v. Wagenbrenner*, 2011-Ohio-2811, ¶ 19 (10th Dist.) (an award of attorney fees is reviewed for an abuse of discretion); *Serra v. Serra*, 2016-Ohio-950, ¶ 35 (10th Dist.) ("[a]n appellate court reviews a trial court's decision allocating tax exemptions for dependents under an abuse of discretion standard").

{¶ 35} An abuse of discretion occurs when a trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Most decisions involving abuses of discretion are unreasonable, as opposed to unconscionable or

arbitrary. *Aetna Better Health, Inc. v. Colbert*, 2012-Ohio-6206, ¶ 21 (10th Dist.). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id*. Furthermore, "[w]hen reviewing an assignment of error for an abuse of discretion, an appellate court may not merely substitute its judgment for that of the trial court." *Asbanyoli v. Haddadin*, 2024-Ohio-170, ¶ 11 (10th Dist.).

## IV. LEGAL ANALYSIS

### A. Zachary's Assignments of Error

{¶ 36} At the outset, we note that a discussion of Zachary's lack of compliance with the Ohio Rules of Appellate Procedure is warranted. Zachary's amended brief failed to include a table of contents in violation of App.R. 16(A)(1), a table of cases, statutes, and other authorities cited in violation of App.R. 16(A)(2), and a statement of the issues presented for review in violation of App.R. 16(A)(4). Moreover, Zachary's discussions for each of his assignments of error contain very little, if any, citations to the record or legal authority. Per App.R. 16(A)(7), an appellant's brief shall contain arguments "with respect to each assignment of error . . . and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Although there are citations to the record and legal authorities within the sections preceding Zachary's discussions of his assignments of error, his failure to include them within those discussions forces this court to seek out those citations and determine on its own to which assignment(s) of error those citations belong. Nevertheless, in the interests of justice, we will thoroughly review the record and rule on the merits of Zachary's assignments of error.

{¶ 37} For ease of discussion, we will first address Zachary's fourth assignment of error. In his fourth assignment of error, Zachary contends that the trial court abused its discretion in awarding sole custody of the children to Kristen. In a divorce case, a trial court is required to allocate parental rights and responsibilities for the care of the minor children of the marriage. R.C. 3109.04(A). In doing so, the trial court must consider what would be in the best interest of the child. R.C. 3109.04(B)(1). In determining the best interest of a child, the court shall consider all relevant factors, including, but not limited to, those outlined in R.C. 3109.04(F)(1). Factors regarding a determination that shared parenting is in the best interest of the child are contained in R.C. 3109.04(F)(2).

{¶ 38} A review of the trial court's judgment entry/decree of divorce reveals that the court thoroughly reviewed the record and carefully considered each of the statutory factors enumerated in R.C. 3109.04(F)(1). Regarding the wishes of the parents, the court noted that Zachary desired a shared parenting plan. Zachary testified that he would prefer that Kristen and the children move back to central Ohio, but he understood the children were currently doing well in Montgomery County. He was also in agreement with Kristen being the school placement parent. On the other hand, Kristen wanted to be designated the sole residential parent and legal custodian of the children. The court also noted, at the beginning of the case, the temporary orders designated both parents as temporary legal custodians and residential parents. *See* R.C. 3109.04(F)(1)(a).

{¶ 39} In its discussion of the children's interactions and interrelationships with each other, their parents, and any other parties, the trial court noted that it presumed the children were bonded with each other because they have always resided together and there was no evidence to the contrary. Furthermore, all witnesses testified that the children had strong bonds and good relationships with each parent. R.C. 3109.04(F)(1)(c). The trial court went on to note that despite the drastic changes in their lives, the children were doing well in their school/daycare placements and had friends in their community in Montgomery County. R.C. 3109.04(F)(1)(d). Neither party testified that they had significant physical or mental health concerns that would negatively impact on their ability to parent the children. The trial court did note that Kristen had a diagnosis of PTSD, but she was working with a mental health provider and taking medication. Although Kristen expressed concerns for several personality traits she observed in Zachary, Dr. Lowenstein testified that Zachary did not possess any mental health difficulties that would prevent him from caring for the children. As for Z.S. and L.S., both were previously engaged with Help Me Grow due to minor delays, and Z.S. was engaged in counseling. R.C. 3109.04(F)(1)(e).

{¶ 40} Regarding which parent was more likely to honor and facilitate parenting time, visitation, and companionship rights, the trial court noted that neither party testified about continuous willful denials of court-ordered parenting time. R.C. 3109.04(F)(1)(f). However, both parties displayed difficulties agreeing on court order interpretation and had communication issues regarding parenting time between the children and the non-possessory parent. The court went on to state that Kristen actively engaged with the court

ordered parent-coach, but Zachary's engagement was "lackluster at best." (June 18, 2024 Jgmt. Entry/Decree of Divorce at 17.) Finally, Zachary, as the child support obligor, was current on all of his child support and consistently made payments throughout the pendency of the case.

{¶ 41} Despite striking Zachary's shared parenting plan, the trial court still thoroughly addressed and considered the factors outlined in R.C. 3109.04(F)(2). With regards to the parents' ability to cooperate and make decisions jointly, the trial court noted that both parents, as well as the GAL, testified to concerns regarding the parties' ability to cooperate and make joint decisions with respect to the children. R.C. 3109.04(F)(2)(a). Both parents testified that they wanted their children to have good relationships with the other parent. Thus, the court concluded that both parents could encourage love, affection, and contact between the children and the other parent. R.C. 3109.04(F)(2)(b). As for the history of or potential for domestic violence, the trial court articulated the differing opinions of the parties without making a finding either way. R.C. 3109.04(F)(2)(c). There were no allegations of child abuse. The judgment entry noted that the parties live approximately one hour from each other. R.C. 3109.04(F)(2)(d). Finally, the court noted Heckert's recommendations. R.C. 3109.04(F)(2)(e).

{¶ 42} The trial court also considered the factors regarding parenting time set out in R.C. 3109.051(D). The judgment entry reiterated the relevant findings from R.C. 3109.04(F)(2) and (3). The court noted that Z.S. was five years old and L.S. was three years old. R.C. 3109.051(D)(4). Additionally, the parents worked full-time and exhibited the ability to work around their parenting time, as well as the children's school and other activities. R.C. 3109.051(D)(3). As for the children's health and safety, the trial court noted Zachary's concerns with Kristen's alcohol use and bouts of crying in front of the children. Heckert expressed no concerns about the children's health and well-being with either parent. R.C. 3901.051(D)(7). The court noted that the parents have demonstrated the ability to agree on make-up parenting time but concerns still remained regarding the parties' communication and cooperation. R.C. 3109.051(D)(10).

{¶ 43} Upon our review of the record and the trial court's decision, we cannot find that the court's determination in this matter as to child custody was an abuse of discretion. As illustrated above, the court thoroughly addressed and considered each of the applicable

statutory factors regarding the best interest of the children, shared parenting, and parenting time. The court's specific factual findings appear for the most part to be neutral in nature, considering each parent's respective positions. For example, the judgment acknowledged the positive relationships each child has with each parent. Additionally, the trial court neutrally addressed Kristen's allegations of domestic abuse without siding with one party over the other. In short, the court carefully considered each party's position and made findings of fact that were supported by the testimony and evidence presented at trial.

{¶ 44} The trial court's conclusion to grant Kristen sole legal custody of the children was driven, at least in part, by the parties' communication difficulties and the challenges they had in making joint decisions regarding the children. The parties were engaged in a highly contentious, approximately three-year-long divorce and custody dispute. The record is replete with instances of both parties causing difficulties in communication and decision making. For example, Kristen testified that Zachary did not permit her to return to the marital residence for her belongings. On the other hand, Zachary testified about Kristen's chaotic communication about important issues. Zachary indicated that Kristen would continuously make time changes to events on the Our Family Wizard ("OFW") calendar, often in very small increments. Furthermore, when it came time for Z.S. to enroll in school, Kristen went back and forth as to which school the child would attend. Although there is no evidence in the record to suggest that these were done with malicious intent, these issues speak generally to the difficulties the parties had in communication and cooperation.

{¶ 45} Decisions involving the custody of children are accorded great deference on review. *Miller*, 37 Ohio St.3d at 74. We find that the trial court's decision to award sole custody to Kristen was not unreasonable, arbitrary, or unconscionable. The record shows that Kristen was the primary caregiver for the children their entire lives. The evidence presented at trial established that after a period of adjustment, the children appeared to be doing well in the Dayton area. There was extensive testimony regarding a strong, dependable family support system Kristen had to help support both her and the children in Dayton. Kristen testified that the parties' communication was getting worse and that she did not believe they could make joint decisions regarding the children. Although Zachary testified the communication was getting better and believed he and Kristen could cooperate, the trial court was in the best position to determine the credibility of the

witnesses. *Harrison v. Harrison*, 1992 Ohio App. LEXIS 831, *17 (10th Dist. Feb. 25, 1992). Given the evidence before the trial court, it was not unreasonable for it to have concerns regarding the ability of the parties to co-parent and accordingly award sole custody to Kristen. *Asbanyoli*, 2024-Ohio-170, at ¶ 20 (10th Dist.) (not an abuse of discretion to award sole custody to appellee given justifiable concerns over the parties' ability to co-parent).

{¶ 46} Based on the foregoing, appellant's fourth assignment of error is overruled.

{¶ 47} It is axiomatic that if a trial court did not abuse its discretion in granting a parent sole legal custody, it also is not an abuse of discretion to deny the other parent's proposed shared parenting plan. Thus, our resolution of Zachary's fourth assignment of error is dispositive of his remaining assignments of error. Nevertheless, we will address them on their merits.

{¶ 48} In his first assignment of error, Zachary alleges that the trial court abused its discretion in striking his proposed shared parenting plan as untimely. More specifically, Zachary alleges that Kristen was not deprived of due process because the parties operated under a shared parenting plan for 16 months under temporary orders, and the particulars of the plan were brought up during settlement negotiations, as well as Zachary's testimony during trial.

{¶ 49} R.C. 3109.04(G) states that a plan for shared parenting "shall be filed . . . at a time at least thirty days prior to the hearing on the issue of the parental rights and responsibilities for the care of the children." A number of appellate courts have held that the aforementioned deadline is discretionary, not mandatory. *See Harris v. Harris*, 105 Ohio App.3d 671, 674 (2d Dist. 1995). As such, trial courts are afforded a reasonable degree of flexibility in considering plans for shared parenting filed outside of R.C. 3109.04(G)'s time limit. *Id.* However, those courts have also recognized that the untimely filing of a shared parenting plan interferes with an opposing party's right to due process. *Id.* A determination as to whether a party's due process rights were protected focuses on whether said party had an adequate opportunity to respond to the plan. *Id.*

{¶ 50} In this case, it is undisputed that Zachary did not file his proposed shared parenting plan within the 30-day time limit set forth in R.C. 3109.04(G). The plan was filed on January 8, 2024, the day before the eighth day of trial and a little over 2.5 years after Zachary originally filed for divorce. In fact, the plan was filed after Zachary had already

rested his case-in-chief. For several reasons, Zachary argues that Kristen had an adequate opportunity to respond to the plan. First, he argues that he provided the plan to all of the parties in June 2023. However, he fails to point to the portion of this case's voluminous record that supports this assertion. Second, he states that Kristen had adequate notice because the parties operated under temporary shared parenting orders for the first 16 months this matter was pending. However, in March 2023, those temporary orders were modified to grant Kristen status as the temporary residential parent and legal custodian. Finally, Zachary argues that he testified at trial about his desired shared parenting provisions. Indeed, Zachary testified that he "would like to have a shared parenting arrangement." (Tr. Vol. V at 453.) However, he also testified that he "accepted that the children [were] going to grow up in Dayton." *Id.* He also testified that he "conceded" that Kristen would be the school residence parent and was "okay with the children residing in Dayton." (Tr. Vol. III at 248; Tr. Vol. IV at 393.) Thus, it was not necessarily clear whether he was requesting shared parenting or simply expanded parenting time.

{¶ 51} In sum, although trial courts may exercise a reasonable degree of flexibility with regards to R.C. 3109.04(G)'s time limit, "it is not abuse of discretion when [the trial court] merely declin[es] to grant that flexibility." *In re B.D.*, 2021-Ohio-3792, at ¶ 24 (11th Dist.). This court has previously reversed a trial court's order of shared parenting where the plan was not timely shared or filed. *Jarvis v. Jarvis*, 1995 Ohio App. LEXIS 3142, *15-16 (10th Dist. July 25, 1995); *see also In re Minnick*, 2003-Ohio-4245, ¶ 12 (12th Dist.); *Creighton v. Creighton*, 2000 Ohio App. LEXIS 388, *5-6 (5th Dist. Feb. 7, 2000). Thus, upon review of the record before us, it cannot be said that the trial court's decision to strike Zachary's plan for shared parenting was unreasonable, arbitrary, or unconscionable.

{¶ 52} Based on the foregoing, we overrule Zachary's first assignment of error.

{¶ 53} In his second assignment of error, Zachary contends that the trial court erred in failing to award shared parenting based on the recommendation of an allegedly biased GAL. "Courts have recognized that the allegation of bias (or prejudice) in a guardian ad litem is not accurate when it reflects the guardian ad litem fulfilling his or her duty to his ward." *Lee v. Starr*, 2020-Ohio-1649, ¶ 56 (5th Dist.). On appeal, Zachary fails to cite any specific duty outlined in Sup.R. 48.03(D) that Heckert failed to fulfill. Similarly, our review of the record has not uncovered any neglect on the part of Heckert regarding the

responsibilities of a GAL. Furthermore, Zachary failed to object to Heckert's behavior or seek to have him removed in the trial court. Thus, he arguably waived his right to raise this issue on appeal. *Harr v. Jackson Twp.*, 2012-Ohio-2030, ¶ 32 (10th Dist.). Indeed, at least one Ohio court of appeals has rejected an assignment of error regarding GAL bias where the appellant failed to raise an objection regarding the GAL's behavior until the final recommendation. *Globokar v. Globokar*, 2010-Ohio-1737, ¶ 24-25 (5th Dist.). Similarly, in this case, the record is devoid of any objections to the GAL's conduct until this appeal.

{¶ 54} It is worth noting that outside of the trial court's discussion of R.C. 3109.04(F)(2)(e), which requires it to consider the GAL's recommendation, the trial court only mentioned the GAL one other time in its shared parenting analysis. In its discussion of the parties' ability to cooperate under R.C. 3109.04(F)(2)(a), the trial court stated:

> The GAL testified that the parties struggle to communicate and submitted lengthy Our Family Wizard ("OFW") communications to corroborate his testimony. The GAL was clear to the Court that it was both parties that suffered from communication issues and did not lay singular fault with either party.

(June 18, 2024 Jgmt. Entry/Decree of Divorce at 19.) This finding regarding Heckert's testimony did not favor either party. Ultimately, what appeared to sway the trial court's finding was that the parties "both testified to concerns regarding their ability to cooperate." *Id.* In sum, a review of the decree of divorce reveals that the trial court's decision against shared parenting was based on far more than just Heckert's recommendation.

{¶ 55} In his brief, Zachary points to an ex parte conversation between Heckert and Dr. Lowenstein as evidence of Heckert's bias. In *Roberts v. McGrady*, 1995 Ohio App. LEXIS 2039, *11-12 (9th Dist. May 10, 1995), the appellant argued that the GAL was biased because she took the opposing party, his wife, and the child to her home where they played basketball. Because the trier of fact was made aware of this incident and the GAL's recommendation was only a piece of evidence for the court's consideration, the Ninth District found that any unfair bias was harmless error. *Id.* at ¶ 12. Similarly, the trial court in this case was aware of Heckert's conversation with Zachary's psychologist, that psychologist testified on Zachary's behalf despite that conversation, there was no evidence that Heckert entered into his task with a predisposition toward Kristen, and the trial court's

analysis focused on far more than Heckert's recommendation and testimony. As such, even if there were some unfair biases in this matter, it was harmless error.

{¶ 56} In short, it is axiomatic that any GAL's recommendation in certain custody matters may favor one of the parties. This does not necessarily reflect bias or prejudice. "[I]t is important to recognize that a trial court is not bound by the recommendation of the guardian ad litem." *Lee*, 2020-Ohio-1649, at ¶ 64 (5th Dist.). Moreover, "[d]isagreement with the court's ultimate determination of custody does not demonstrate bias, prejudice, or improper action on the part of the GAL." *Id.* at ¶ 57.

{¶ 57} Based on the foregoing, we overrule Zachary's second assignment of error.

{¶ 58} In Zachary's third assignment of error, he alleges that the trial court abused its discretion in failing to order shared parenting, when it awarded Zachary all privileges normally included in shared parenting. Zachary's four-sentence argument fails to cite, nor can this court find any authorities that support the contentions he sets forth in his third assignment of error. It is well settled that it is the appellant's burden to affirmatively demonstrate error on appeal. *White v. Cent. Ohio Gaming Ventures, L.L.C.*, 2019-Ohio-1078, ¶ 25 (10th Dist.). "[I]t is not the duty of an appellate court to create an argument on an appellant's behalf." *Saha v. Research Inst. at Nationwide Children's Hosp.*, 2019-Ohio-1792, ¶ 29 (10th Dist.). Zachary has failed to meet the burden in demonstrating error. Moreover, we have already found that the trial court did not abuse its discretion in its award of sole custody to Kristen.

{¶ 59} Based on the foregoing, we overrule Zachary's third assignment of error.

## B. Kristen's Assignments of Error

{¶ 60} In her first assignment of error, Kristen alleges that the trial court abused its discretion in its determination of the parties' gross incomes. More specifically, Kristen argues that the court failed to find that the parties were voluntarily unemployed or underemployed prior to imputing income to both parties. Additionally, she argues that the court failed to consider the factors contained in R.C. 3119.01(C)(10), (13), and (18).

{¶ 61} "To calculate the amount of child support, the trial court must first determine each parent's annual income." *Dunn v. Dunn*, 2025-Ohio-584, ¶ 12 (10th Dist.). R.C. 3119.021(C)(10) defines income as the following:

> (a) For a parent who is employed to full capacity, the gross income of the parent;

(b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent.

R.C. 3119.01(C)(13) defines "[g]ross income" in part as "the total of all earned and unearned income from all sources during a calendar year." R.C. 3119.01(C)(13) goes on to list certain items that are excluded from gross income. One of those items is "[n]onrecurring or unsustainable income or cash flow items." R.C. 3119.01(C)(13)(e).

{¶ 62} In imputing to Zachary an annual income of $163,145.46, the trial court averaged his income for 2020, 2021, and 2022. The trial court's rationale for this was that Zachary frequently took short-term, project-based employment opportunities to help pay for litigation and child support. Thus, the court appeared to be classifying Zachary's second employment opportunities as nonrecurring or unsustainable, although not specifically finding as such.

{¶ 63} We find this to be an abuse of discretion for several reasons. First, the trial court found that "[Kristen] argued that [Zachary] works additionally for Natera and earns an additional $114,995.50 from that employment. [Zachary] denied this additional amount of income." (June 18, 2024 Jgmt. Entry/Decree of Divorce at 28.) This is belied by the record. Near the end of the proceedings in this matter, Zachary testified that he recently took on a second full-time job as a business intelligence analyst for Natera. (Tr. Vol. VIII at 937.) In that position, he was paid $55.2863 per hour and worked 40 hours per week. That is approximately $115,000.00 per year. This was in addition to his job at IDS where the record reflects he earned $142,000.00 per year. Thus, the trial court's finding with regard to Zachary's employment at Natera was unsupported by the record.

{¶ 64} Second, the trial court never specifically found that Zachary's Natera job, or any of his previous side jobs, were nonrecurring or unsustainable. Even if we did take the judgment entry as making such a finding, that is not supported by the record. Although Zachary did testify that he occasionally took short-term side jobs and having a second job was unsustainable, nothing in his testimony about his position at Natera indicated this was a temporary job. In fact, Zachary testified that the employment was full-time and that he will "continue" to work 40 hours per week there. (Tr. Vol. VIII at 941.) Zachary testified that he took the job to help pay his child support, which will continue for years given the ages of the children.

{¶ 65} In sum, the trial court made findings unsupported by Zachary's own testimony and failed to explain why Zachary's Natera income should not be included in his annual income. In fact, it does not appear that the trial court considered the income at all. On this record, we cannot say that there was sound reasoning to support the trial court's decision to impute to Zachary an annual income of $163,145.46.

{¶ 66} We also find that the trial court abused its discretion in imputing to Kristen an annual income of $60,000.00. The record reflects that Kristen makes $43,573.09 per year as a school counselor. Pursuant to R.C. 3119.01(C)(10)(b), income includes, "[f]or a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent." In determining potential income, "the trial court must (1) determine that a parent's unemployment or underemployment is voluntary, and (2) determine what the parent would have earned if fully employed using the criteria set forth in R.C. 3119.01(C)(18)(a)(i) through (xi)." *Dunn*, 2025-Ohio-584, at ¶ 16 (10th Dist.). To satisfy the statutory requirement, the trial court "must expressly find that a parent is voluntarily unemployed or underemployed as a condition precedent to imputing potential income for child-support-calculation purposes." *Ayers v. Ayers*, 2024-Ohio-1833, ¶ 27. "Failure to make such express findings constitutes reversible error." *Dunn* at ¶ 16. A review of the decree of divorce reveals that the trial court did not make those express findings. The record contains sufficient information where the court could conclude that Kristen is underemployed based on her advanced degrees, certification to be a tutor, no physical impairments, and a family support system available if she did tutor in the evening. However, it was an abuse of discretion for the trial court to impute Kristen income of $60,000.00 without expressly determining that she was voluntarily unemployed or underemployed.

{¶ 67} Based on the foregoing, Kristen's first assignment of error is sustained.

{¶ 68} In her second assignment of error, Kristen alleges that the trial court abused its discretion by failing to award her spousal support. More specifically, she alleges that the court failed to make adequate findings and conclusions to support its income calculations and failed to appropriately consider the statutory factors under R.C. 3105.18. The factors to be considered by a trial court in determining whether to award spousal support are found in R.C. 3105.18(C). A review of the court's decree of divorce reveals that the court carefully

reviewed and considered each of the statutory factors in determining not to award spousal support. Kristen's brief fails to cite any specific finding of fact that was erroneous, outside of the parties' annual incomes, which we addressed above. It also fails to cite to any one specific statutory factor the trial court improperly weighed.

{¶ 69} Indeed, upon our review we cannot find any parts of the trial court's analysis that were unreasonable, arbitrary, or unconscionable except for the error in determining the parties' gross incomes. However, as the trial court pointed out, Kristen is well-educated and has gainful employment. She is residing in a home owned by her parents and operates on a pay-what-you-can system with them regarding certain bills. As part of the parties' agreement regarding financial assets, Kristen was transferred 100 percent interest in several of Zachary's accounts. Although the parties' incomes are drastically different, that is but one factor in the spousal support analysis. R.C. 3105.18(C)(1)(a). In sum, we cannot say that the trial court abused its discretion by failing to award Kristen spousal support.

{¶ 70} As such, we overrule Kristen's second assignment of error.

{¶ 71} In Kristen's third assignment of error, it should be noted that our resolution of Kristen's first assignment of error impacts these issues. We find that the parties' gross incomes were improperly calculated and each of the issues raised here, in varying degrees, rely on the amounts of those incomes. Thus, to the limited extent the trial court's decisions on these issues were based on those improperly calculated incomes, Kristen's third assignment of error is sustained. *See Lafever v. Lafever*, 2015-Ohio-823, ¶ 45-46 (12th Dist.) (sustaining husband's assignment of error to the extent the trial court failed to properly calculate the wife's income).

{¶ 72} First, Kristen alleges that the trial court erred by incorrectly completing the child support worksheet regarding work-related childcare costs and the cost of health insurance. Kristen points out that the trial court found that Zachary's health insurance costs were $5,138.12, but used $13,200.00 on line 10(b) of the child support worksheet. She also states that the trial court failed to split the childcare costs between the children on the worksheet. Finally, Kristen alleges that the court failed to incorporate the cash medical support from the worksheet into the order. Upon our review, these all appear to be clerical errors or oversights that will necessarily have to be addressed after this matter is remanded due to our resolution of Kristen's first assignment of error. Once the trial court has properly

determined the parties' gross incomes, these issues can be fixed or adjusted during the subsequent recalculation.

{¶ 73} Kristen also alleges that the trial court erred in calculating Kristen's childcare costs in the amount of $11,780.00. However, Kristen's own brief incorrectly calculates her childcare costs. She testified that she only required 10 months of childcare, but in her brief she multiplies by 52 weeks, which is a full year. Additionally, she did not account for Zachary's potential parenting time or school breaks. Based on the record before us, the cost of L.S.'s childcare would be $9,400.00 (40 x $235.00) and the cost of Z.S.'s would be $2,976.00 (40 x $74.40). (Tr. Vol. VIII at 837.) This totals $12,376.00 in childcare costs. However, this still does not consider Zachary's potential parenting time or breaks for winter, spring, etc.

{¶ 74} It should be noted that Kristen's closing argument in the trial court did not mention a specific childcare cost amount. (Mar. 14, 2024 Def.'s Closing Argument at 10-11.) In fact, it only stated that childcare "expenses should be split proportionally to income as well." *Id*. at 10. Second, Kristen's brief is devoid of citations to any legal authority, statutory or otherwise, in support of her argument regarding childcare costs. As we previously stated regarding Zachary's arguments, it is the appellant's burden to affirmatively demonstrate error on appeal. *White*, 2019-Ohio-1078, at ¶ 25 (10th Dist.). Last, any reduction in childcare costs by the trial court could be the result of it considering certain school or holiday breaks, as well as any potential parenting time by Zachary. Based on the record before us, unless based on the improperly calculated incomes, the trial court did not abuse its discretion in calculating Kristen's childcare costs.

{¶ 75} Finally, Kristen argues that the trial court erred in ordering her to shoulder 40 percent of the children's extraordinary medical expenses. Extraordinary medical expenses are defined as "any uninsured medical expenses incurred for a child during a calendar year that exceed the total cash medical support amount owed by the parents during that year." R.C. 3119.01(C)(8). Again, Kristen fails to cite any legal authority in support of her argument. In this instance, she fails to even explain why the trial court was wrong in its allocation. She points out the effect the trial court's decision had on her obligation, but fails to point to any fact, evidence, or legal authority explaining why that decision was wrong. As we previously stated, "it is not the duty of an appellate court to

create an argument on an appellant's behalf." *Saha*, 2019-Ohio-1792, at ¶ 29 (10th Dist.). We refuse to do so here.

{¶ 76} With that being said, "[a]lthough courts frequently allocate responsibility for extraordinary medical expenses between parents based upon their income shares, neither this practice nor any other methodology for allocation of extraordinary medical expenses is embodied by statute." *In re S.C.*, 2020-Ohio-233, ¶ 36 (12th Dist.). Thus, given that it is possible the trial court relied on its improper calculation of the parties' incomes in allocating the extraordinary medical expenses, the trial court must determine on remand whether any changes to those incomes require a change in the allocation.

{¶ 77} Based on the foregoing, to the limited extent the trial court's decisions on these issues were based on its improper calculations of the parties' incomes, Kristen's assignment of error is sustained. Upon remand, the trial court is ordered to determine the parties' incomes and then consider whether any changes to those incomes affect the court's orders regarding childcare costs, cash medical support if the parties do not have access to private health insurance, and extraordinary medical expense allocation.

{¶ 78} In her fourth assignment of error, Kristen alleges that the trial court abused its discretion by awarding Zachary the right to claim Z.S. as a dependent for federal income tax purposes. More specifically, Kristen argues that the court failed to properly consider the statutory factors for allocating the tax exemption and whether allowing Zachary to claim one of the children as a dependent for tax purposes was in the children's best interest.

{¶ 79} While Kristen's recitation of the law in this area is correct, what she fails to point out is that she requested this outcome in her closing argument. Kristen's closing argument specifically stated, "So long as [Zachary] is current in child support, the parties should split the children for tax purposes with [Kristen] claiming [L.S.] each year and [Zachary] claiming [Z.S]." (Mar. 14, 2024 Def.'s Closing Argument at 11.) While it is true Kristen testified that, "[a]*t this point*," she wanted to claim both children, we find that this request was not unequivocal. (Emphasis added.) (Tr. Vol. VIII at 901.) In contrast, the closing argument, filed months later, expressed a clear request for the court to split the tax exemptions between the parties. Pursuant to the invited-error doctrine, a party cannot take advantage of a trial court's error that she invited or induced. *Mahbub v. Mahbub*, 2025-Ohio-5867, ¶ 70 (10th Dist.). Kristen cannot request a certain outcome, have the trial court

grant that request, and then claim on appeal she was somehow aggrieved. *Akin v. Akin*, 2011-Ohio-2765, ¶ 17 (9th Dist.) (applying the invited-error doctrine when the court granted one of appellant's requested outcomes). Also, it is not unreasonable or arbitrary for the court to order parties to split the tax exemptions when the child support obligor has substantially complied with court orders in that obligation.

{¶ 80} Based on the foregoing, Kristen's fourth assignment of error is overruled.

{¶ 81} In her fifth assignment of error, Kristen alleges that the trial court abused its discretion in failing to award her attorney fees. More specifically, Kristen alleges that she was entitled to attorney fees due to not being awarded temporary spousal support and fees incurred due to Zachary's allegedly excessive and unnecessary filings in this matter. "In an action for divorce . . . or an appeal of that action, a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable." R.C. 3105.73(A). In determining whether such an award is equitable, a court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors. *Id.*

{¶ 82} Based on a review of the record, it cannot be said that the trial court abused its discretion in declining to award Kristen attorney fees. The court carefully considered all of the relevant factors in reaching its decision. Although it is undisputed that Zachary's annual income is substantially higher than Kristen's, it is worth noting that based on the agreement of the parties, Kristen received 100 percent of Zachary's interest in several accounts. Kristen also received a lump sum payment of $5,296 from Zachary. The record also reflects that Kristen admittedly withdrew $26,000 from Zachary's bank account and used those funds to pay a portion of her attorney fees. Her accessing the above funds is in addition to her annual salary. As previously noted, Kristen resided in a home owned by her parents with a pay-what-she-can arrangement. Considering the above facts, the court's denial of attorney fees was not unreasonable, arbitrary, or unconscionable.

{¶ 83} Thus, based on the foregoing, Kristen's fifth assignment of error is overruled.

## V. CONCLUSION

{¶ 84} Based on the foregoing, we overrule each of Zachary's assignments of error. We overrule Kristen's second, fourth, and fifth assignments of error. We sustain Kristen's first assignment of error. We also sustain, in part, Kristen's third assignment of error to the

extent those issues are affected by the parties' improperly calculated incomes.  As such, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations.  This matter is remanded to that court for further proceedings consistent with this decision.

*Judgment affirmed in part and reversed in part*;
*cause remanded.*

DORRIAN and LELAND, JJ., concur.

_____